# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In the Matter of the Detention of: | No.  60356-0-II |
| S.P., | |
| Appellant. | UNPUBLISHED OPINION |

PRICE, J. — S.P. was ordered to be admitted for 90 days at Western State Hospital (WSH) for an involuntary commitment.  S.P. appeals, arguing that there was insufficient evidence for the superior court to conclude that he was gravely disabled.  We affirm the superior court.

FACTS

I.  BACKGROUND

In April 2024, S.P. was arrested and charged with second degree malicious mischief.  One month later, S.P. was evaluated and determined to "lack[] the capacity to understand the nature of the proceedings against him and the capacity to assist in his own defense" due to a mental disease or defect.  Clerk's Papers (CP) at 8.  Mental health clinicians attempted to restore S.P.'s competency; however, because his symptoms failed to improve, his criminal charges were eventually dismissed.  Following the dismissal, the trial court ordered that the Department of Social and Health Services and WSH evaluate S.P.'s eligibility for civil commitment.

II.  CIVIL COMMITMENT PETITION AND ATTACHED DECLARATION

In July 2024, following their evaluation of S.P., WSH treatment providers Doctors Hae Yuo and Vanessa Kieu petitioned for S.P. to be civilly committed for involuntary mental health treatment.  The petition, filed under chapter 71.05 RCW, stated that S.P. qualified for involuntary treatment because he was "gravely disabled" as a result of a behavioral health disorder.  CP at 5.

The providers submitted a declaration explaining three general bases for their petition: (1) S.P.'s medical and criminal history, (2) recent records and reports from mental health clinicians regarding S.P.'s behavior and symptoms, and (3) their own personal observations of S.P.'s behavior and responses from an evaluation conducted in July 2024.

As for S.P.'s medical and criminal history, according to the declaration, S.P. had 12 prior criminal convictions that had occurred between June 1995 and June 2022.  The declaration also detailed S.P.'s extensive history of receiving inpatient and outpatient treatment for his behavioral health disorders, including schizophrenia.  S.P. was previously admitted to receive inpatient treatment at WSH three times.  He also received emergency crisis treatment at hospital emergency rooms multiple times between 2003 and 2022 and received ongoing treatment from outpatient crisis interventions, behavioral health hotlines, and case management services.

Recent records and reports from clinicians and WSH staff who interacted with S.P. documented "disorganized thought processes," delusions, and paranoia.  CP at 15.  Staff also reported that there was an instance where S.P. was "verbally aggressive" with staff and another where S.P. had instigated a fight with another patient and had to be restrained.  CP at 16.

The personal observations from Doctors Yuo and Kieu included in the declaration paralleled the staff reports.  The doctors described S.P. as "rambling," and having "perseverative

2

beliefs that may not be reality-based." CP at 20-21. For example, S.P. had told the providers that he believed that he was famous for inventing plans for an engine for airplanes that were later stolen by his parents and for creating "a love song for women to sing karaoke to their loved ones." CP at 21.

Dr. Yuo and Dr. Kieu also stated in the declaration that in addition to these rants and delusions, S.P. did not appear to have a "feasible plan" if he was released from WSH. CP at 22. S.P. denied having a mental illness and refused to take his medications because "he did not believe in their benefits." CP at 23.

Based on S.P.'s medical and criminal history, the reports of WSH staff, and their own interactions with S.P., Doctors Yuo and Kieu recommended in the declaration that S.P. remain at WSH "until such time that he has demonstrated stabilization in his symptomology, is fully able to participate in treatment, and is able to discuss reality-based ways to maintain safety and success in the community." CP at 24.

III. Initial Hearing and Court Commissioner's Decision

A. Dr. Kieu's Testimony

On September 5, 2024, the court commissioner held a hearing on the petition. During the hearing, Dr. Kieu provided live testimony about the basis for the recommendation that S.P. would benefit from additional involuntary treatment. Her testimony generally mirrored the declaration submitted with the petition.

Dr. Kieu explained that S.P. "was not able to engage in a meaningful and reciprocal and reality-based conversation." Verbatim Rep. of Proc. (VRP) at 7-8. She said that her experiences

with S.P. were consistent with those of others who were involved with S.P.'s treatment and that they observed him presenting "similar symptom[s]." VRP at 8.

Dr. Kieu also testified that S.P. lacked "any insight" into his condition or symptoms. VRP at 12. She said that despite his symptoms, S.P. denied having a mental health disorder, did not take medication, and had no plans to follow up with a mental health provider after being discharged.

> [W]hen I asked directly about discharge planning, when I'm attempting to assess his judgment, he rambled something about detail[s] that [did] not relate to the question posed.
>
> And there's no concrete plans in place for him at this point. He's not able to communicate a clear plan of what would happen once he return[s] back to the community, how he [would] access medication, housing, food, shelter, in general.

VRP at 13. Based on S.P.'s symptoms and lack of a plan, Dr. Kieu did not think that S.P. would "consistently be able to ensure that his basic health and safety needs were met" if he were released from WSH at the time of the hearing and that this caused "great concern." VRP at 13, 16.

On cross-examination, Dr. Kieu also discussed some concerns about S.P.'s weight. Based on staff reports, there were concerns that S.P. had a pattern of not eating the food that had been provided to him, and he was being monitored by both a dietician and nursing staff. Dr. Kieu also said that S.P., "in his very disorganized thinking," had talked about certain types of raw foods and being healthy but that it was unclear what S.P. had meant. VRP at 19.

B.  S.P.'S TESTIMONY

S.P. also testified, and his testimony largely focused on his food preferences. He explained that he had read the book "Let Food Be Your Medicine[:] Dietary Changes Proven to Prevent or Reverse Diseases," which he said provided a diet that was for "depression, anxiety, bipolar

disorder, and schizophrenia." VRP at 27-28. Based on this book's recommendations, S.P. stated

that he liked to eat "salads and berries and hamburgers" because of their nutritional value. VRP

at 26-27. Although he had asked for this kind of food while he was at WSH, he claimed that he

was denied it. Instead, according to S.P., the food WSH provided him actually worsened his

schizophrenia. He stated,

> Now, let me go to one thing that will also reveal something to you. Foods that worsen schizophrenia, it lists right here. That's what they're feeding me here. They refuse to give me what I just mentioned. They're giving me this instead. This worsens the condition. Okay?
>
> And this is what may improve . . . it. This is what improves the condition. It's all from the same—the same doctor.
>
> . . . .
>
> I've been doing it all my lifetime.
>
> And I function perfectly fine in the community. I never bothered anybody, never threatened anybody, never had any problem with anybody.

VRP at 30-31.

When later asked whether he had a place to live after being release from WSH, S.P. did

not directly answer and said that he would "acquire the monies" that he had. VRP at 31.

C. THE COMMISSIONER'S DECISION

Although the commissioner found both parties' testimony "compelling" and that the case

was "close," the commissioner concluded that S.P. was gravely disabled and granted the petition.

VRP at 35. The commissioner explained that their decision ultimately rested on concerns

regarding S.P.'s delusional thinking.

5

And I think the concern of this Court is some of the other delusional thinking that was testified to by Dr. Kieu about what his resources—what resources might be available to him and what he would do if he were released. He—the testimony was that he says that he has millions of dollars and that he owns some pretty expensive real estate or high-value real estate, including being half owner of the Clark County Courthouse, which isn't very likely.

VRP at 36.

The commissioner raised some concerns as to whether the petitioners had met their burden to prove that S.P. had a "grave disability," but the commissioner found that additional treatment was in S.P.'s best interest in order for S.P. to be properly transitioned back into the community.

I don't know that we are actually at enough of a clear, cogent, and convincing standard to get to grave disability based on—based on the testimony today, so— but I'm also very reluctant to do a release today, given that I think we do have some revolving-door issues in this case.

So I think what I'm going to do is find that we're just—we're just meeting that burden of grave disability based on the testimony of Dr. Kieu, but I'm also going to find that an [less restrictive alternative is] in his best interest so that can begin to be explored so that he has a structured release and not—I'm not finding a straight release out today would be in his best interest, based on some of the lingering issues that are still there, but I think discharge planning should begin on his case.

VRP at 36-37.

In the written order, the commissioner concluded that S.P. was gravely disabled and ordered him to be admitted for 90 days at WSH for an involuntary commitment. The commissioner's written findings of fact were comprised of detailed summaries of the testimony of Dr. Kieu and S.P. For the conclusion of law, the commissioner checked the box indicating that S.P. "is/continues to be gravely disabled" because S.P.

[X] as a result of [schizophrenia] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, is not receiving such care as is essential for health and safety.

CP at 53 (capitalization and boldface omitted).

Following the commissioner's decision, S.P. moved for revision, which was denied by the superior court. The superior court adopted the commissioner's findings of fact and conclusions of law, finding that they were supported by clear, cogent, and convincing evidence.

S.P. appeals.[1]

ANALYSIS

S.P. argues that the petitioners failed present sufficient evidence that he was gravely disabled, and thus, the commissioner's findings and conclusion, and the superior court's subsequent denial of his motion for revision were error. We disagree.

A court commissioner's rulings are subject to revision by the superior court. RCW 2.24.050. Once the superior court reviews the commissioner's findings and makes a decision on a party's motion for revision, any appeal is from that decision, not the commissioner's decision. *Faciszewski v. Brown*, 187 Wn.2d 308, 313 n.2, 386 P.3d 711 (2016). But "[w]hen the superior court denies a motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision." *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531, 536 (2021).

When reviewing a challenge to an involuntary commitment order, we review whether the relevant findings are supported by substantial evidence and whether those findings support the superior court's (and the commissioner's) conclusions of law. *In re Det. of A.F.*, 20 Wn. App. 2d

---

[1] Although S.P.'s commitment order expired in September 2024, both parties agree that the appeal is not moot due to the adverse consequences an involuntary commitment order may have on future determinations. *See In re Det. of M.K.*, 168 Wn. App. 621, 629-30, 279 P.3d 897 (2012).

115, 125, 498 P.3d 1006 (2021), *review denied*, 199 Wn.2d 1009 (2022).  Substantial evidence means that there must be sufficient evidence to convince a fair-minded person of the court's findings.  *Id.*  The evidence supporting the findings must be "more substantial" than a preponderance of the evidence, the petitioner's assertions must be shown to be " 'highly probable.' "  *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986) (quoting *In re Interest of Pawling*, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)).  When deciding whether there was sufficient evidence, we review the evidence in the light most favorable to the petitioner.  *A.F.*, 20 Wn. App. 2d at 125.  All unchallenged findings are considered verities on appeal.  *In re Det. of L.S.*, 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

After an initial 14-day commitment period, the superior court may order a person experiencing mental illness to be committed for an additional 90 days if they find the person is "gravely disabled."  RCW 71.05.280(4), .320(1).  A person who has been diagnosed with a behavioral health disorder can meet the definition of "gravely disabled" in two ways.  RCW 71.05.020(25).  The first prong (prong (a)) is if the person's behavioral health disorder causes them to be "in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety."  RCW 71.05.020(25)(a).  The second prong (prong (b)) is if the person's disorder causes them to "manifest[] severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety."  RCW 71.05.020(25)(b).  Even if the person is currently stable in a structured care setting, prong (b) is still met if the person would not receive or seek out the care as is necessary for their health and safety if released.  *In re Det. of Labelle*, 107 Wn.2d at 207-208.

The petitioner bears the burden of proving at least one of these prongs by clear, cogent, and convincing evidence. RCW 71.05.280(4), .320(1), (4); 71.05.310. When determining whether the burden has been met, the superior court must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior. RCW 71.05.245(1).

Here, S.P. argues that the petitioners failed to meet their burden to prove that he was "gravely disabled" and thus the superior court's findings and conclusions were not supported by substantial evidence. S.P. appears to contend that the petitioners' sole basis for commitment was "S.P.'s failure to eat all of the food provided to him by WSH." Appellant's Opening Br. at 18.

Citing to our decision, *In re Detention of A.M.*, S.P. contends that dietary issues alone would be insufficient to justify commitment, and that the petitioners have failed to prove that S.P.'s dietary issues are indeed harmful to S.P.'s health and safety.

In *Det. of A.M*, A.M. had delusions, which resulted in intermittent eating patterns and avoidance of food. 17 Wn. App. 2d at 327. A.M. argued that these issues were insufficient to show grave disability under prong (a). *Id.* at 334-35. We agreed, holding that although A.M.'s mental disorders caused him to be unable to provide for his own essential needs (food), this alone was not enough. *Id.* In order to fully satisfy prong (a), the State was required to also provide evidence that "[A.M.]'s reluctance to eat was or could be harmful to [him] . . . ." *Id.* at 335.

Analogizing to *Det. of A.M.*, S.P. essentially argues the evidence failed to show that his eating habits were harmful to him. He contends that the evidence "showed that he had a good grasp of his dietary habits and what foods he thought were good for him." Appellant's Opening Br. at 18. S.P. highlights the testimony that "he avidly read and followed a dietary book that

specified a certain diet 'for depression, anxiety, bipolar disorder, and schizophrenia,' " and that he only refused to eat food provided by WSH that he believed would damage his health. Appellant's Opening Br. at 18 (quoting VRP at 27-28). Even if petitioners had "a vague concern" that he would not take care of himself, S.P. argues that this "does not establish grave disability by clear, cogent and convincing evidence." Appellant's Opening Br. at 19.

S.P.'s reliance on *A.M.* is misplaced. The portion of the analysis on which S.P. relies concerns only whether there was sufficient evidence of A.M. being gravely disabled under prong (a). Here, the commissioner only relied on prong (b) to conclude that S.P. was gravely disabled.[2]

Moreover, petitioners presented ample evidence that supports the superior court's conclusion that prong (b) was met, evidence that far exceeded mere dietary issues. In fact, the doctors' declaration and the trial testimony from Dr. Kieu discussed many behaviors and disorders that had little to do with S.P.'s eating habits. For example, as pointed out by the State, the doctors and staff reported that S.P.: (1) "was not able to engage in meaningful and reciprocal reality-based conversations," (2) "respond[ed] to internal stimuli by talking loudly to himself and reporting odors that were not real," (3) expressed delusional beliefs "that were detached from reality," and (4) refused to take his psychotropic medications because he does not believe that he needs them.

---

[2] The commissioner's written order (which was adopted by the superior court) mirrors the language of prong (b); it stated,

> [X] as a result of [schizophrenia] manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over actions, is not receiving such care as is essential for health and safety.

CP at 53.

Br. of Resp't at 16-17. All of these concerns were referenced in the commissioner's written findings. The commissioner's findings also noted that the doctors had particular concerns over S.P.'s "grandiose beliefs" that he had millions of dollars and that S.P. had no clear plan for after his release from WSH. CP at 53. The doctors feared that if S.P. were released without further treatment, "he would not be able to ensure his basic health and safety needs were met" and would potentially "put himself in a situation that could jeopardize his safety or others' safety." CP at 54. All of this evidence, which well exceeded concerns with S.P.'s diet, was relevant to the definition of gravely disabled under prong (b) and supported the commissioner's decision.

In summary, the petitioners presented S.P.'s mental health history, detailed declarations, and testimony that showed that S.P.'s behavioral health disorder, if left untreated, would likely result in severe deterioration of his ability to function in the community. When construed in favor of the State, this presentation constituted clear, cogent, and convincing evidence that S.P. met the definition of gravely disabled under prong (b). Thus, the superior court's decision was supported by substantial evidence. The superior court did not err.[3]

---

[3] S.P. also argues for the first time on appeal that the superior court's findings were unsupported because the State relied on impermissible hearsay evidence. Because S.P. failed to make objections to the State's witness testimony below and fails to make any argument on appeal that this issue falls under one of the exceptions to RAP 2.5(a), we decline to review this issue.

No. 60356-0-II

CONCLUSION

We affirm the superior court.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

CRUSER, C.J.

MAXA, J.